and others v. Claimants, Advisory Committee, and others. Arguments not to exceed 15 minutes per side. Ms. Greenspan for the appellants. Make your feed. Good morning. My name is Debra Greenspan. I'm here representing the appellants in this matter. I'd like to reserve 3 minutes for rebuttal, if that's okay. The district court issued an order that authorized the payment of contingent second priority payments at a point in time in this case where we're partway through a 15-year settlement program. We have over 80,000 people who still have the right to bring first priority payments that are not contingent and who have the right under the plan to be assured that their first priority payments would actually be paid before contingent second priority payments may issue. We submit that the court's decision errs as a matter of law in four respects. First, the court misinterpreted and misapplied and in fact rewrote the standard that is set forth in the plan that governs the determination of whether the contingent second priority payments may be issued. The court further erred and violated the plan requirements by elevating one type of second priority payments, allowing them to be distributed while the other two categories of second priority payments were not even considered in the plan. Third, the court erred by assuming the availability of two sources of funding that are not to be considered available assets in this circumstance. The first source that the court relied on was the litigation fund. The second was a $200 million amount that is the subject of a dispute that is currently under advisement with the district court. Finally, the court erred in refusing to even consider the evidence submitted by the appellants in this matter. The court admitted the declarations, the expert declarations into the record, but then advised in the opinion that she simply would not consider that information at all. This violates the plan and it violates the appellant's right to be heard and to submit relevant information for the court's consideration. Counsel, at some point in your adversary's brief, it seemed to me that they said, well, the $400 million, yeah, that might have been a problem, but we're not relying on it and the part about the other two categories not getting paid, they're saying that doesn't, that they might be wrong, but that doesn't matter. Do I read their briefs right? And if so, why are those points relevant if they sort of concede them now? I believe that the claimants' advisory committee takes the position that while the court may have referenced the litigation fund, the $400 million litigation fund, the calculation that the court cited in its opinion did not count that litigation fund, but the court nevertheless said it is proper to consider that fund in making this determination, and so we don't know whether, to what extent the court considered that additional money as an integral component of the other two categories of second priority payments. I believe what the claimants' advisory committee says is that they don't dispute that the Class 16 payments should be made at the same time as premium payments, which is the category that the court authorized, and they say they wouldn't dispute a determination to go ahead and pay those payments, but they say that there's really no basis to pay the increased severity payments, the third category, because no one really knows what they are. While I understand their position, that doesn't square with what the plan requires, which is that all second priority payments have the same priority. They need to be given the same consideration. Does somebody have an interest in pushing those other two categories? If you're claiming you're underwater already, why would you want these other payments to be made? No one is requesting that they be made. The program, those payments, if they are to be made at all, they may not be paid on the same basis, which is in violation of the plan. So they need to be taken into consideration in this process. Let me ask you one other, I hate to get into the math weeds, but their basic position, as I understand it, is there's like 120 million cushion. That's the difference between the 1.95 and the 1.83 billion. And then there's some discussion that 83 has been paid out and that leaves 68. Well, the math doesn't work. It would leave a much lesser number, and then they have a little footnote about 28 million or 31 million has been paid out, and they sort of want to add that back in. Am I following the math right? And if so, where does that 28 or 31 come in that makes the math come out right? I believe, and I'm sure counsel for the CAC will clarify this, but I believe that what they're describing is there's a settlement fund cap of 1.95 billion. And in order to determine how much the total assets that are available for consideration, they're accounting for the 27 to 31 million that has already been paid in the litigation fund. So this is just, you could do the math in two different ways, and they have simply elected to add that amount in so that when you determine the assets available for distribution, you've already accounted for what's been paid in the litigation fund. I don't think it's incorrect. Because if we get back to the really basis here, they say there's this pot, let's call it 68, as they say, and that's going to cover everything. And then we get into the adequate assurance versus adequate provision, which to me is probably the guts of this case. That is, are they speculating really on projections out, or is that a reasonable estimate? Is that a fair statement? I think that's a fair statement of what their position is, that they're saying that there has been an estimate, that leaves a cushion, and that's fine, and that's enough, and that's our concern and our position is that that isn't really what the plan says. So the plan creates two categories of payments. It has all claims, these are first priority payments, and then it has these contingent second priority payments. And the plan says that in many places that these first priority payments are supposed to be protected, they're supposed to be preserved, and we're supposed to assure their payment, and there are many provisions that state that. And then the plan says if there's enough money, we can pay these contingent second priority payments. And the way it does that is it sets forth the standard. It says that second priority payments may not be distributed until the district court determines that all allowed and allowable claims have either been paid or adequate provision has been made to assure such payment. So there's two ways to basically authorize the payment of these second priority payments. And counsel, just to be clear, if you should prevail and these payments aren't made now, and everything turns out the way they say it will turn out, will these people be paid at the end of the process? Yes, if it turns out as they say there would be sufficient assets and they would be paid. So the dispute and I'm trying to characterize the dispute and the difference in our positions here. The language is clear. The words that are used are not mysterious words. They have a plain meaning. They have plain dictionary definitions, and that is really what contract interpretation principles tell us to do when we're interpreting a contract. We look to the plain meaning of the words. Which specific words are you talking about? Adequate provision? I want to talk about assure and adequate provision. Those are the specific words. The entire phrase. Reasonably assured for the next paragraph. That's a different provision of the... It's the next paragraph. Right. So there are two sections of the settlement facility agreement that speak to the standard for authorization for the second priority payments. That is in section 701 C4 and 703A. Then there is a section that you're citing, I believe, that is talking about the fact that these two payments could potentially be paid at the same time. But if they are, you still need to give priority to the first priority payment. So if you run into a funding cap problem and you are paying both first and second priority payments at the same time, you have to defer the second priority payments in order to make sure you've paid the first priority payments timely. You can delay the second priority payments. So there are two different types of provisions. That provision doesn't speak to the standard for authorization. The standard says the other payments have to be paid or adequate provision has to be made to assure such payments. Nobody disagrees about the T. Everybody agrees that that's what it means. The issue is really is there some sort of modification of that term. So you look to the next part of the phrase adequate provision. Well, a provision is to make an arrangement to provide for something. That's what that means. So what would be a provision in this context? One example would be that the trustee has already cut the checks to be paid. They're ready to go out the door, but they haven't actually been paid. That would be a provision to assure the payments. There are many other examples of what could be a provision, but a provision is an act to provide. It's not some other kind of process. So this phrase tells us that the court has to determine that these claims have been paid. That's easy to determine if that had in fact occurred, or that there's an adequate provision. There has been an arrangement made to assure the payments. So what did the district court do? The district court said, well, I understand that assure means guarantee, but I think that we should really modify that term. And the court concluded that the term should be modified because there is something called a premium payment provision, and the intent of that provision is to authorize the second priority payments to be paid at the same time as first priority payments. So that was the first step that the court took. There is no premium payment provision, but the court took the section, Judge Quist, that you're referring to that talks about the timing of payments, and called that and said that there was a purpose to that provision that overrides this plain meaning of the term assure in the authorization provision. Then the court said that it's more appropriate to consider the phrase to be adequate assurance than assure, and finally went on to characterize its own task in the following way. The court says that its job is to determine whether there are sufficient provisions to also pay first priority payments. That's in the district court's decision. That is how the district court characterized her task. So we have a phrase that says adequate provision must be made to assure that's been translated in this decision to mean sufficient provisions to also pay first priority payments. It's as if the first priority payments are a secondary type of payment. So the plain meaning of this term has been shifted to an entirely different inquiry. These two sentences do not mean the same thing. The question remains, and I think the argument on the other side is it doesn't matter. You make very good points. Strictly reading the plan, we need to do that. The other side says, eh, it'll work out fine anyway. Well, that's not the charge that was given to the court. I realize. So that's the point, is that you're saying enforce the charge. That's correct, Your Honor. Thank you. If you're fired, you'll have your time for rebuttal. Good morning. Jeffrey Trackman for the Claimants Advisory Committee. I want to step back and explain a few reasons why we believe this court should be looking at this appeal through a lens of extensive deference, which is actually what the panel that denied the stay has already held. This is not, we've had other appeals that deal with threshold eligibility for benefits. This is not like that. This is intensely factual determination and the plan expressly entrusted to the discretion of the district court. We have to remember Dow Corning agreed in the plan documents to the specific neutrals who are going to do the evaluation of the adequacy of the fund. They agreed to the method that should be applied. They agreed that the procedures could be streamlined to approve a recommendation. You called the neutrals? Is this the finance committee? You have the finance committee, which are neutrals that are charged with weighing all the interest in the case. They work with the independent assessor, who is also a neutral. And of course the court is a neutral. And we are, the Claimants Advisory Committee is a fiduciary charged with weighing the interest of future and current claimants. Dow Corning has a different interest here, which is not to pay the money. So everything they say has to be taken with that grain of salt. But we work together in this process year after year. Were they wrong when they said that it's just a question of pay me now or pay me later, that these people will get paid if your estimates turn out to be right? They will after 15 years and really more like 20 years of waiting. I mean, we went out with this plan in 1999. And claimants, this was a provision of the plan that was heavily marketed, that there would be these premiums because people had waited so long in the bankruptcy. And they were going to get an extra 20% on the disease claims, an extra 25% on the rupture claims. And Dow Corning's expert testified that that would likely be around the seventh year. And they were warned, oh, it may take a few years. This is not like Dow ConShield, where all the claims are supposed to be paid and then they can give the leftover money. It was always anticipated. And in fact, the expert was cross-examined at confirmation whether a delay of as much as seven years would undermine this as an attractive part of the plan. Because he was using this to predict that there'd be a higher acceptance rate for this settlement than in the RSP. They're just ignoring reality of how this was presented. The assumption was we would go for a few years, we would do projections, we would be pretty sure there'd be enough money, but not a virtual guarantee. A virtual guarantee would require everyone to wait until 2019. And people are dying. And people are falling out of touch with the facility. And this is the case with every issue. They appeal everything because they're trying to stall paying the money. And we're only paying half because everybody knew there was plenty of money to pay half. There was a dispute over whether we had quite enough the projections were quite clear enough to pay the whole amount. So the Finance Committee took a conservative approach. Excuse me, did I misunderstand Ms. Greenspan then when she said you all agree on what adequate means? Adequate provision? Maybe I misunderstood. I think she said that assurance means guarantee. So look, assurance means difference between assurance and adequate provision to assure. But let me ask you about that because maybe that's the guts of it at one level. If I make a will and it says that the executor first shall make to assure my wife's standard of living, I would kind of interpret that to mean I want T-bills or I want an insurance policy. If I say I want adequate assurance that she'll have her lifestyle, then maybe the executor can invest in Lehman Brothers or collateral debt swaps. I mean isn't that kind of the difference, or at least the one interpretation of the language would be that way. Is it your interpretation that they're the same? I think it's a couple of issues. One issue is there are times when the word is used in the context of a promise and there are times when it's used in the context of a projection. And so the Finance Committee and the District Court thought that the more relevant authority were the cases under Bankruptcy Code 365 B1C which talks about adequate assurance of the future performance of an assumed contract. And in those cases, it's far less than a guarantee. In fact, it's sometimes viewed as 51%. Now we would not have agreed to pay this money based on 51%. We are concerned about protecting the first priority claims do come first. We would require a very high level of expectation of adequacy, but just not virtually guarantee. It's like 95 versus 99.999%. So you're, in a sense, are you telling me you would stand by 95%? I mean, don't hold me to that because I'm using an example. There's a big difference between 95 and 70, let's say. Exactly. And the other thing is the plan uses different combinations of words and the disclosure statement, which is not formally part of the plan, but the disclosure statement was how Dow Corning and the committee communicated with thousands of tort claimants. So you're pushing a lot of this back to, you might say, intent of the framers. Well, yeah. Marketed the PR and the agreements beyond the words. So let me ask you this about it. When we say that people would get paid if they have to wait somewhat longer, is that with some type of interest? Because everything talks about net present value. That is, if you pay Ms. X $100,000 today, but if they win, you're going to pay her in five years. Is she going to get $120,000 then? Absolutely not. Is she going to get exactly the same amount? I'm sorry. Is she going to get exactly the same amount? There's no cost of living or interest to the individual claims, the individual claimants. That's something Dow Corning bargained for and we honor it, but it means that the delay comes out of the pocket of the claimants. Every year of delay devalues every payment to every claimant. The net present value has to do with valuing the funding stream that Dow Corning has to pay back to the effective date. So actually, the delay has led us to have more nominal dollars and we can actually pay more claims. So the delay makes it, every year of delay makes it less likely that we're going to bust the cap. And that's why, you talk about the net present value cushion, that was assuming payment in 2013. Well, we're now paying it in 2014, so it's around the $74 million net present value cap. And the other half is going to be paid further down the road. Tell me again quickly why you get this $28 or $31 million extra for something that's already been paid. I couldn't figure that out. Because we have a $2.35 net present value fund and a sub fund of $1.95 net present value. Let's just start out with the $1.95 and the $1.83 and that's $120 million. But the money is all being paid into one trust. And so what we're looking at is a running total of qualified transfers that go into the trust. And because the trust has paid out a certain amount to pay for litigation, which ended up being much less expensive than everybody thought to resolve, that amount is credited against the $400. Credit back. But doesn't that implicate the issue of whether the $400 should be available or not? Well, that's a separate issue, truly. Well, because you just said it's credited against the $400. Right. So the $400 is really $371 or $370. That's what's left in funding obligations to be applied to litigation. The question of whether we need that to pay the settlement claims will never arise. Let me take you to one other point, then, because you set up the neutrals. Everybody agrees you're going to have this neutral. Did they agree that the neutral was unassailable? Because they say, in effect, okay, he's neutral, but it's just projections and math and statistics and we have some guys that we want the judge to consider as to why that's not right. And usually judges do that. If they had a claim that the agreed methodology had been horribly botched, okay, that they just didn't apply it correctly, it was lazy, it was wrong, they could come in and show that. But that's not what their evidence was offered to show. They're coming in to say that this methodology that's been applied for years and years with them at the table and they never complained, they never objected. They asked a lot of questions. They asked for more information. But they never got up and said, hey, wait a second, this whole thing that we're going through year after year, the basic methodology is fundamentally flawed. It could never support a projection that could support claims. They never said that. And the judge made a finding that they never said that. And they blithely say, well, we did, we challenged, we complained. They didn't. And now they're coming in and trying to offer a declaration that says this basic methodology is fundamentally flawed for one reason, because it doesn't consider epidemiology. Well, it's not necessary for this type of projection to consider epidemiology, but if it was available it would be used. The fact is there is none. And their experts said we don't have any epidemiology. What we have is epidemiology for individual symptoms. Dry eyes, aches and pains. There is no epidemiology that says the combination of symptoms that constitute a covered condition. There is no epidemiology like that. And to say, well, we have this many claimants with this symptom and this many claimants with that symptom, and try to turn that into projections of who's going to have claims and who's going to have a proof of claim and who's going to be able to get, it's junk science. It's complete speculation. So it's useless. The other thing they say is lacking is there should be an error rate analysis. And this gets into some technical stuff. But we have a declaration from our expert explaining why this type of projection, there's so many variables, you just don't do an error rate analysis. But it does not follow that our methodology is unreliable. Because we have one thing that you don't often have. We have year after year of being able to check the results and fine tune against the prior years. But is it fair to say that the district court didn't consider these attacks? Or are you saying that the district court's opinion in effect refuted the attacks even though they weren't considered? I think the district court looked at that evidence and said this is not going to be helpful because it's attacking a methodology that they've already agreed to. And I'm not going to open the door. This is not a no vote litigation. This is the application of a settlement. And I think the normal discretion that a judge would have to regulate what evidence comes in is broader. She did not engage with the individual merits of those debates. But if you go beyond, it's harmless error. If you let that in, you have answers. We have answers. It's all in the record. And it's at best harmless error. Because the evidence being offered was I mean, I can go through a list of other issues that they played with numbers and playing games. And in certain ways it's very misleading. But they did not choose to engage some of these things until the reply brief. I think if the court has specific questions about the merits of the competing evidence, I'd be happy to address them. But otherwise, I'm not sure I need to do that. We haven't gone back to these. Because really there's no question that there's enough money to pay the half amount. They've created these other straw man arguments. And we sort of skipped over them. I don't know if you want to hear from us about them. But I mean, these other categories of second priority payments. You say there's no question that there's enough. If we believe that, then the standard we're applying doesn't make a difference. Because if we buy that part, then there is adequate provision to guarantee. Well, if you say virtual guarantee, there's always some small risk. I do think that's an issue presented for the court. What standard is appropriate? Maybe there have been so many things in the financial system that were ironclad over the past ten years that didn't turn out to be.  I don't see that there's that big a difference. Dow Corning, in the disclosure statement, which went to claims, in the part of the disclosure statement that is summarizing the plan up front, there's a footnote that says these will be paid once the priority payments are adequate assurance it will be paid. And Dow Corning says, well, that's a stray notation. Well, it's not. It's how they described it. We described  it. And, you know, if it's really that big a difference between those two standards, then the disclosure statement was materially misleading. This sounds like a RISA plan description. Does the disclosure statement prevail over the agreement? No, no. Strictly speaking, the plan prevails over the disclosure statement. And they'll point to the disclaimers and qualifications. And there's a place on page 95 in the risk section where it just says assured. I don't think anybody actually read that paragraph. They probably did read the other one. But the point is they didn't see this as so clearly different as a standard. And I think you have to look at it in the full context of what was intended, that we were inducing people to settle and telling them that this is not like one of these cases where you're going to get paid only at the end. We're going to pay you once we're pretty sure we have enough money. That was the spirit of it. So pretty sure versus assure versus guarantee is back to where we are. It really comes down to in the end weighing the interest of thousands of claimants who have been waiting for years for this money, who were induced on that basis to settle against a very small risk that at the end of the day a few claimants will have their claims reduced at the end. And every fiduciary... And those claimants would be first priority claimants. There might be others as well, but it could well include... Right. Well, could be others. Second priority. But at the end of the day, all the fiduciaries who are charged with weighing those interests made a good faith judgment and there's no reason for this court to upset that. Thank you. Any questions? Thank you, Counsel. Thank you very much. And just weave in, would you agree that the claimants that they want to pay now, if they're paid 25 years from now, they'll get the same amount, not some increased amount? That's correct. I want to respond to a couple of the questions that came up during Mr. Trachman's argument. First, the court does say in the opinion, the court will not consider the exhibits and expert testimony submitted by the debtors, representatives, and the shareholders, since the settlement facility agreement provides that the court consider the recommendation of the finance committee based on the independent assessor's analysis and projections. So the court specifically says she did not consider that information. Why do you say she was wrong to not consider that? In her discretion, so we put it in context. Because the plan does not say, as she indicates here, that the decision of the district court, whether the standard has been met, should be based solely on the information of the independent assessor and the finance committee. It says the finance committee is supposed to submit the report of the independent assessor, but it does not restrict the district court's inquiry at all. In fact, it charges the district court with making a determination that these payments are assured. And I'd like to go back to the comment that Mr. Trachman made. He said that he doesn't think it should be 99%, but it could be 95% assurance. But there's no place in the report of the independent assessor or in the submission of the finance committee that that is one of the criticisms, that is one of the points that we made and that our expert made, was that if you're going to try to meet a standard that has such a high threshold, it says assured, we have to protect these first priority payments, then at least the report should quantify for the judge what the risks are and the uncertainties are. The report did not attempt to do that. In terms of this idea that we know there's enough money, or everybody's pretty sure that there's enough money, or there aren't going to be very many more additional claims, that sort of flies in the face of the plan and the structure of the plan. The plan gave claimants until June of 2019 to make their disease claims. And the concept there was not that people were waiting, that they had a disease claim in year one, they just waited 15 years. It was that their disease claims would manifest during this period of time, and they should have the right to bring these claims. So what drives the claims? What drives the claims is the development of these medical conditions. So that is why we want these medical conditions and how common they are in the population to be relevant to the court's determination, because you can't have a claim unless you have those conditions. Do you disagree with what we were told by your colleague, that there is no epidemiology that would be helpful? There are several different conditions where there is epidemiology. There are some standard, well-known, defined diagnoses that are eligible. And then there are also... I think he conceded that there are some, but he just essentially said that's unhelpful at this stage, and it really can't be done. I think that it is, I would say it's not unhelpful. It gives you a sense of what is out there that could become a claim. And if there had been some analysis of the claims that had come in fairly recently, before the Finance Committee made its recommendation into what were the conditions that were diagnosed, what were the common conditions that we were seeing in the population, that is an analysis that also could have been done, and you could have derived that from the claimant population. That was not done. You and your client were at the table when all this was decided quite some time ago. Aren't you late in raising this now? You were at the table, and now you're... You have to make it really quickly, because I shouldn't have asked the question. It is incorrect to say that there's an agreed methodology in the plan. The plan simply says we should have a report that tells you how many pending claims there are, how much they've been paid, how many are sitting there waiting to be paid, and then it says projection of future claims. It doesn't say how to project the future claims. It doesn't say don't consider the medical conditions. You might have answered this before, but what standard of review are we looking at here? De novo or abusive discretion? The agreement itself says abusive discretion, and this judge, as pointed out by another panel, has spent years on this case. So what is our standard of review here? That question has been addressed by this court about at least three times in the last couple of years. There have been a couple of different appeals where this precise issue has emerged, is that if the issue is a question of interpretation of the plan, that this is a de novo review, and that this is something that this court is eminently qualified and does every day. But I also submit that if you were to even say that it was an abusive discretion standard under these circumstances where we believe there's a clear error of law in interpreting the plan, that you would meet the abusive discretion standard as well. Finally, counsel, your adversary said something about a stay having been denied by another panel of this on the ground. Are these payments being made? They are. The settlement facility has paid about $40 million out of the first batch of $110 million of payments. So they are being paid on a monthly basis. If we were to go the other way, would those be recouped? I think the settlement facility could attempt to recoup those payments. I think they would be unsuccessful in getting 100 percent of those payments back. But we understand that some are not yet been distributed to individuals. Some claimants have additional claims pending that you could credit against this plan. Thank you. Thank you, counsel. All right. Case will be submitted. Clerk may call the